The Honorable Karen A. Overstreet
Chapter 11
Sale/Bidding Procedures Hearing Date and
Time: August 13, 2010 at 9:30 a.m.
Response Due: August 12, 2010 by 12:00 noon

Sale Hearing Date: October 1, 2010
Sale Hearing Time: 9:30 a.m.
Response Due: September 24, 2010
Hearing Location: 700 Stewart St., Rm. 7206

# UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF WASHINGTON
## AT SEATTLE

In re

TACO DEL MAR FRANCHISING CORP.
Tax ID / EIN: 91-1723173

              Debtor.

CONRAD & BARRY INVESTMENTS, INC.
Tax ID / EIN: 91-1667322

              Debtor.

Lead Case No. 10-10528-KAO
(Administratively Consolidated with 10-10529-KAO)

MOTION FOR APPROVAL OF: (i) SALE, PURSUANT TO AN AUCTION, OF SUBSTANTIALLY ALL OF DEBTORS' ASSETS AND BUSINESS FREE AND CLEAR OF LIENS; (ii) BIDDING, NOTICE AND SALE PROCEDURES; (iii) ASSUMPTION AND ASSIGNMENT OF CONTRACTS; (iv) REJECTION OF CERTAIN CONTRACTS; AND (vi) ADDITIONAL RELIEF

Taco Del Mar Franchising Corp. ("TDM") and Conrad & Barry Investments, Inc. ("C&B"), the Debtors and Debtors In Possession (hereinafter "Debtors"), through their counsel George S. Treperinas and Karr Tuttle Campbell, move the Court for approval of (i) sale of substantially all of Debtors' assets and business free and clear of all liens, claims, interests and encumbrances pursuant to Bankruptcy Code §363; (ii) bidding and notice procedures; (iii) assumption and assignment of certain of TDM's executory contracts; (iv) rejection and assumption of certain of Debtors'

MOTION FOR APPROVAL OF: (i) SALE…OF SUBSTANTIALLY ALL OF
DEBTORS' ASSETS …FREE AND CLEAR OF LIENS; (ii) BIDDING,
NOTICE AND SALE PROCEDURES; (iii) ASSUMPTION AND
ASSIGNMENT OF CONTRACTS; (iv) REJECTION OF CERTAIN
CONTRACTS; AND (vi) ADDITIONAL RELIEF - 1
#753779 v2 / 43827-002

*Law Offices*
KARR TUTTLE CAMPBELL
*A Professional Service Corporation*
1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

contracts; and (v) additional relief as described herein. This motion (the "Sale Motion") is supported by the Declaration of Larry Destro (the "Destro Declaration").

## I. FACTUAL BACKGROUND

1. TDM and its 100% shareholder C&B each filed voluntary petitions (collectively, the "Reorganization Cases") under Chapter 11 of the United States Bankruptcy Code (the "Code") in the United States Bankruptcy Court for the Western District of Washington at Seattle on January 22, 2010 (the "Petition Date").

2. Both TDM and C&B are operating their businesses and managing their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Code. No trustee or examiner has yet been appointed in the Reorganization Cases.

3. C&B was founded by two brothers, James and John Schmidt, and began operating Taco Del Mar restaurants in 1992. Taco Del Mar grew into a small restaurant chain in the Puget Sound region, and C&B decided to franchise the concept in 1996, at or about which time TDM was incorporated to act as the franchisor. Eventually, all of the Taco Del Mar restaurants owned by C&B were sold to franchisees. By 2002, the Taco Del Mar chain had grown to about 70 restaurants and was operating at nearly break even. A critical decision was made to change the business model after 2002.

4. Beginning in 2003, TDM began identifying and entering into Master Development Agreements ("MD Agreements") with persons interested in assisting TDM in developing new restaurants in the United States and in Canada in order to accelerate growth beyond the Northwest market. TDM currently has agreements with 58 such persons (collectively, the "MDs"). The Master

MOTION FOR APPROVAL OF: (i) SALE…OF SUBSTANTIALLY ALL OF DEBTORS' ASSETS …FREE AND CLEAR OF LIENS; (ii) BIDDING, NOTICE AND SALE PROCEDURES; (iii) ASSUMPTION AND ASSIGNMENT OF CONTRACTS; (iv) REJECTION OF CERTAIN CONTRACTS; AND  (vi) ADDITIONAL RELIEF - 2

#753779 v2 / 43827-002

*Law Offices*
KARR TUTTLE CAMPBELL
*A Professional Service Corporation*
1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

Development Agreement model allowed TDM to receive fees from the MDs, as well as fees from new franchisees. From 2002 through 2005, the period of TDM's most rapid growth, TDM's revenues grew dramatically, from $950,000 in 2002 to over $5,400,000 in 2005. At the same time, however, TDM's expenses increased from $991,000 in 2002 to $5,481,000 in 2005. TDM remained profitable through 2005, but as the number of new restaurant franchises and MDs began to decline, TDM subsequently began to lose money. TDM had negative profits in each year from 2006–2009, with 2009 accumulated losses exceeding $2,800,000.

5. The number of Taco Del Mar restaurants increased from 74 in 2003 to a high of 270 at the end of fiscal year 2008. Eventually, however, weaknesses in TDM's development model (selecting poor franchisees and poor sites) and brand in non-core markets began to show. These weaknesses resulted in the closure of over 200 Taco Del Mar restaurants from 2005– 2009. During this period, several competitive concepts were quickly expanding in the U.S. (Chipotle, Qdoba, Baja Fresh, and several others). These factors, coupled with TDM's weakening financial condition and the economic downturn in the U.S., slowed new restaurant growth and new market development for TDM. From 2005–2009, however, the restaurants in TDM's core markets established themselves as a relatively stable base from which to re-launch the TDM brand.

6. TDM's struggles over the past 3–4 years have resulted in rising debt from $248,000 in 2002 to now over $3,000,000. Such debt has resulted from recurring losses, poor expense management, litigation expenses related to TDM guaranties of failed franchisee leases, litigation expenses pertaining to the propriety of franchise sales, and numerous judgments against TDM resulting from such litigation.

*Law Offices*
KARR TUTTLE CAMPBELL
*A Professional Service Corporation*
1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

7.     Over the last few years, landlords to the Debtors' franchisees have requested guaranties of franchisee leases from TDM. TDM has guarantied certain franchisee leases in key target markets on a case-by-case basis. TDM has also executed some leases as tenant and thereafter assigned its rights under the leases to franchisees, leaving TDM as a responsible party under the lease for at least some period of time. As some franchisees have defaulted on their lease obligations, some landlords have looked to TDM for performance of leases where TDM has remained liable as an assignor or guarantor. TDM has negotiated settlements and had judgments entered against it arising from such claims in recent years. TDM remains at risk for additional such claims on leases that remain in effect. TDM has recently faced additional claims from disgruntled franchisees and MDs for reimbursement of franchise and MD fees.

8.     At filing, TDM's debts related to franchisee leases, disgruntled franchisees, and MD fees amount to approximately $564,500. Within a month of filing, one judgment creditor executed on TDM bank accounts to recover $125,000 and another had commenced supplemental proceedings in an effort to collect an additional $120,000 from TDM.

9.     This bankruptcy filing was the only sure way to protect and perhaps even increase the value of TDM. Without filing for bankruptcy, it is unlikely that TDM could have survived without having to terminate all employees and close its business entirely.

10.     TDM implemented various action items designed to curb losses, including rejection of its Canadian MDs Agreements, rejection of its office lease (adopting a "virtual office model"). The "Taco Del Mar" brand has tremendous traction in its core markets. The opportunity to grow

MOTION FOR APPROVAL OF: (i) SALE…OF SUBSTANTIALLY ALL OF
DEBTORS' ASSETS …FREE AND CLEAR OF LIENS; (ii) BIDDING,
NOTICE AND SALE PROCEDURES; (iii) ASSUMPTION AND
ASSIGNMENT OF CONTRACTS; (iv) REJECTION OF CERTAIN
CONTRACTS; AND  (vi) ADDITIONAL RELIEF - 4
#753779 v2 / 43827-002

*Law Offices*
KARR TUTTLE CAMPBELL
*A Professional Service Corporation*
1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

the value of this brand without the constraints imposed by the pre-petition debt burden and threats of litigation is great.

11. At filing, TDM's outstanding secured debts totaled approximately $550,000. Priority debt scheduled by TDM was approximately $360,000. Unsecured scheduled debt totaled approximately $2.0 million dollars. The Court entered an order setting April 15, 2010 as the last date for Creditors to file proofs of claims in the Debtors' Reorganization Cases.

12. TDM day to day operations continue to be funded with royalties which are directly tied to revenues from its franchisees, including royalties from Canadian franchisees. As a result of activities by former Canadian MDs and others interfering with TDM's relations with its Canadian royalties, the Canadian income has dropped since the Petition Date by about $10,000 per week in royalties and $3,000 per week in marketing fees (collected for the benefit of franchisees).

13. From the Petition Date through July 20, 2010 TDM has received gross royalties of $1,778,531, less payments to MDs of $454,959 for a net of $1,323,572.

14. **TDM's Marketing Efforts.** During the past two and one-half years, TDM's board of directors has pursued both the sale of assets (Canada and Western Washington) and the entire company.

15. After the Petition Date, TDM's CEO has worked exhaustively to identify and contact potential buyers, and to reassure franchisees that the Taco Del Mar brand and related franchisor infrastructure will survive the filing for bankruptcy protection herein.

16. TDM has been engaged in discussions with Taco Del Mar Acquisition, Inc., ("Buyer") since before the Petition Date and eventually reached agreement on the terms of an Asset

MOTION FOR APPROVAL OF: (i) SALE…OF SUBSTANTIALLY ALL OF
DEBTORS' ASSETS …FREE AND CLEAR OF LIENS; (ii) BIDDING,
NOTICE AND SALE PROCEDURES; (iii) ASSUMPTION AND
ASSIGNMENT OF CONTRACTS; (iv) REJECTION OF CERTAIN
CONTRACTS; AND  (vi) ADDITIONAL RELIEF - 5
#753779 v2 / 43827-002

*Law Offices*
KARR TUTTLE CAMPBELL
*A Professional Service Corporation*
1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

Purchase Agreement (the "APA"), attached as <u>Exhibit A</u> to the Destro Declaration. The APA provides for a purchase price of $1,950,000 for the Acquired Assets, as further described below (collectively the "Purchase Price").

17.     Based on the Debtors' prepetition sale efforts, the amount of other purchase offers received and contacts with potentially interested parties, the Debtors believe that the Purchase Price is fair and reasonable and is the highest and best offer received to date. While there is hope that the royalties flowing from Canadian operations will increase in the near-term, current financial and cash flow issues dictate that a sale be consummated quickly to ensure the value of the Debtors' assets is preserved. Indeed, absent an expeditious sale or an immediate substantial increase in Canadian royalty payments, the value of the Debtors as a going concern will be placed in severe jeopardy and the Debtors may well be forced to liquidate.

## II. SUMMARY OF TERMS OF PROPOSED SALE

Following is a summary of some of the material terms of the proposed sale ("Proposed Asset Sale") as set forth in the APA:[1]

1.     **Assets to be Purchased.**     The assets to be purchased (the "Acquired Assets") include substantially all of TDM's assets including without limitation all of TDM's rights, title, privileges, benefits and interests in and to:

        (a)     all of Seller's interest in the Taco Del Mar brand;

---

[1] This description of the terms of the APA is intended solely to provide the Court and interested parties with an overview of the significant terms the APA. The Court and interested parties are respectfully referred to the APA for the complete terms of the Asset Sale. In the event of a conflict between the terms included in this overview and the APA, the APA shall govern. Capitalized terms not defined in this Motion have the meanings given in the APA.

MOTION FOR APPROVAL OF: (i) SALE…OF SUBSTANTIALLY ALL OF DEBTORS' ASSETS …FREE AND CLEAR OF LIENS; (ii) BIDDING, NOTICE AND SALE PROCEDURES; (iii) ASSUMPTION AND ASSIGNMENT OF CONTRACTS; (iv) REJECTION OF CERTAIN CONTRACTS; AND  (vi) ADDITIONAL RELIEF - 6

#753779 v2 / 43827-002

*Law Offices*
KARR TUTTLE CAMPBELL
*A Professional Service Corporation*
1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

(b)     all of Seller's operating systems and franchise systems relating to the Taco Del Mar brand, including any and all computers and software, and personal property related thereto, including all computer racks, cables and racks;

(c)     all of Seller's Taco Del Mar Intellectual Property including the following:

(i)     all patents, registered trademarks, registered copyrights, domain names and other Registered IP and unregistered trademarks; and

(ii)     the right to enforce restrictive covenants, including but not limited to confidentiality, nonsolicitation, noncompetition provisions of franchise and master developer agreements used in connection with the Business ((i) and (ii) collectively the "Intellectual Property Assets");

(d)     all of Seller's rights existing under the Assumed Executory Contracts identified in Section 2.2(a) of the APA; and

(e)     all goodwill, if any, to the extent associated with the Acquired Assets.

2.     **Consideration.**   The purchase price for the Acquired Assets shall consist of the Purchase Price, described above.

3.     **Assumed Executory Contracts.**   Pursuant to Section 2.2 of the APA, within 21 days of execution of the APA the Buyer shall provide Debtors with written notice of which Existing Contracts it intends to assume as Assumed Executory Contracts at closing. Upon receipt of Buyer's written disclosure of the Assumed Executory Contracts, Debtors shall file a motion for assumption of such contracts that such contracts be assumed and assigned by order of the Court on the date that the Court approves a final sale of the Acquired Assets to the Buyer. Any such order assuming the Assumed Executory Contracts shall be conditioned upon Closing of the sale to a Successful Bidder desiring an assignment of the Assumed Executory Contracts.

4.     **Cure Costs.**   As described in Section 2.2(b) of the APA, $525,000 shall be paid at closing to cure the Debtors' Seller's pre-Closing obligations to deposit monies collected from Taco

MOTION FOR APPROVAL OF: (i) SALE…OF SUBSTANTIALLY ALL OF DEBTORS' ASSETS …FREE AND CLEAR OF LIENS; (ii) BIDDING, NOTICE AND SALE PROCEDURES; (iii) ASSUMPTION AND ASSIGNMENT OF CONTRACTS; (iv) REJECTION OF CERTAIN CONTRACTS; AND  (vi) ADDITIONAL RELIEF - 7

#753779 v2 / 43827-002

*Law Offices*
KARR TUTTLE CAMPBELL
*A Professional Service Corporation*
1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

Del Mar franchisees into a marketing fund for the Company franchisees whose franchise agreements the Buyer expects to name as Assumed Executory Contracts. Following the closing of the transactions contemplated by the APA, the Buyer shall have full discretion over such funds for the benefit of franchisees. If the Debtors do not have the ability to pay the Cure Costs, the Buyer has the right to pay the Cure Costs and deduct the amount of such payment(s) from the Purchase Price.

5. **Rejection of Contracts.** With respect to any Existing Contracts which are not Assumed Executory Contracts (the "Excluded Contracts") which the Buyer informs the Debtors in writing it requires be rejected as a condition of the sale no later than 21 days after execution of the APA, Debtors shall file a motion for rejection of such contracts that such contracts be rejected by order of the Court on the date that the Court approves a final sale of the Acquired Assets to the Buyer. Any such order rejecting Excluded Contracts shall be conditioned upon Closing of the sale to a Successful Bidder desiring the rejection of the Excluded Contracts.

6. **Conditions.** TDM and Buyer's obligations to consummate the transactions contemplated in the APA are subject to satisfaction of the conditions set forth in Articles VII and VIII of the APA, respectively. Consummation of the sale under the APA is conditioned upon, *inter alia,* entry of the Sales Procedures Order (being filed concurrently herewith) and Sale Order, as defined below in Section III. and attached hereto as Exhibit A.

7. **Higher and Better Offers.** The APA is subject to the submission by third parties of higher or better offers as set forth in the Sale Procedures Order.

MOTION FOR APPROVAL OF: (i) SALE…OF SUBSTANTIALLY ALL OF DEBTORS' ASSETS …FREE AND CLEAR OF LIENS; (ii) BIDDING, NOTICE AND SALE PROCEDURES; (iii) ASSUMPTION AND ASSIGNMENT OF CONTRACTS; (iv) REJECTION OF CERTAIN CONTRACTS; AND (vi) ADDITIONAL RELIEF - 8
#753779 v2 / 43827-002

*Law Offices*
KARR TUTTLE CAMPBELL
*A Professional Service Corporation*
1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

# III. PROPOSED SALE PROCEDURES

## A.     The Bidding Procedures and Break Up Fee

The Debtors and Buyer recognize that the sale of the Acquired Assets as contemplated by the APA is subject to TDM's receipt of higher and better offers.  Therefore, Debtors seek authority to implement certain procedures to ensure that the TDM estate will obtain the best return possible. The Debtors thus request that the Court enter a Sales Procedures Order in the form being filed concurrently herewith, approving the following bidding procedures (the "Bidding Procedures") to be employed with respect to the Proposed Asset Sale.

The Proposed Asset Sale is subject to competitive bidding as set forth herein and approval by the Court at a hearing under Sections 363 and 365 of the Bankruptcy Code (the "Sale Hearing"). The following alternative bid provisions and related bid protections are designed to compensate Buyer for its efforts and agreements to date and the concomitant benefits conferred upon Debtors, and to facilitate a full and fair process designed to maximize the value of the Acquired Assets for the benefit of Debtors' stakeholders:[2]

### 1.     Designation of Stalking Horse Bidder.

a.     Debtors have designated the bid of Buyer ("Stalking Horse Bidder") as the "stalking horse" bid ("Stalking Horse Bid").  As the Stalking Horse Bidder, Buyer shall, upon entry of the Sale Procedures Order, be entitled to the Break-Up Fee (as defined below) and other standard stalking horse protections as discussed below.  **For purposes of these procedures, the Stalking Horse Bidder's deposit requirement is $200,000, which the Debtors' acknowledge they have received and such funds are currently on deposit** in an escrow account designated by Debtors ("Escrow Account").

---

[2] Terms not otherwise defined in this Section III.  A shall have the meanings ascribed to such terms in the Bidding Procedures.  This summary of the Bidding Procedures terms is meant only as a summary of such terms and to the extent there is a conflict between this summary and the terms of the Bidding Procedures, the Bidding Procedures shall govern.

MOTION FOR APPROVAL OF: (i) SALE…OF SUBSTANTIALLY ALL OF
DEBTORS' ASSETS …FREE AND CLEAR OF LIENS; (ii) BIDDING,
NOTICE AND SALE PROCEDURES; (iii) ASSUMPTION AND
ASSIGNMENT OF CONTRACTS; (iv) REJECTION OF CERTAIN
CONTRACTS; AND  (vi) ADDITIONAL RELIEF - 9
#753779 v2 / 43827-002

*Law Offices*
KARR TUTTLE CAMPBELL
*A Professional Service Corporation*
1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

b.   The obligation of Buyer to perform under the APA is conditioned on, among other things, the entry of the Sale Procedures Order by the Bankruptcy Court approving the Bidding Procedures and the Break-Up Fee.

**2.   Auction Process.**

a.   <u>Auction Date</u>. The auction shall take place on the Business Day prior to the day scheduled for the hearing on the Sale Motion at the offices of Karr Tuttle Campbell, 1201 Third Ave., #2900, Seattle, Washington 98101, counsel for the Debtors at 1:00 p.m. PDT, and noticed to all prospective bidders. To be eligible to participate in the auction, all Qualified Bidders must appear in person at this address.

b.   <u>Qualifications to Bid</u>. Only qualified bidders (as described below, the "Qualified Bidders") shall be allowed to participate in the auction. Buyer shall be a Qualified Bidder for all purposes hereunder. **To become a "Qualified Bidder," each prospective bidder shall, on or before 5:00 p.m. PDT on the Business Day that is five (5) Business Days prior to the day scheduled for the hearing on the Sale Motion deliver (i) a good faith deposit in the amount of $250,000 in cash into the Escrow Account** and (ii) a binding letter agreement to George S. Treperinas, Karr Tuttle Campbell, 1201 Third Ave., #2900, Seattle, Washington 98101 (Email: gtreperinas@karrtuttle.com and mmunhall@karrtuttle.com; Fax: (206) 682-7100), counsel for the Debtors, which contains the following:

(1)   **a binding offer to acquire the Acquired Assets for an amount that is at least $250,000 more than the aggregate value of the Opening Bid** (as defined below) ("Over Bid");

(2)   evidence to the reasonably satisfaction of the Debtors of such Qualified Bidder's financial ability to (a) fully and timely perform if it is declared to be the Successful Bidder, and (b) provide adequate assurance of future performance of all contracts to be assigned and any post-closing investments into the Business;

(3)   disclosure of any connections or agreements with Sellers and/or any officer, director or equity security holder of Sellers; and

(4)   an agreement to accept and abide by the terms, conditions and procedures set forth herein.

MOTION FOR APPROVAL OF: (i) SALE…OF SUBSTANTIALLY ALL OF DEBTORS' ASSETS …FREE AND CLEAR OF LIENS; (ii) BIDDING, NOTICE AND SALE PROCEDURES; (iii) ASSUMPTION AND ASSIGNMENT OF CONTRACTS; (iv) REJECTION OF CERTAIN CONTRACTS; AND  (vi) ADDITIONAL RELIEF - 10
#753779 v2 / 43827-002

*Law Offices*
KARR TUTTLE CAMPBELL
*A Professional Service Corporation*
1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

If such bidder contemplates making a bid on terms different than those agreed to by Buyer in the APA, such bidder shall submit with its letter agreement (a) a detailed description of the differences, and (b) a proposed form of asset purchase agreement marked to show the differences between its proposed asset purchase agreement and the APA; provided that a Qualified Bidder shall not be permitted to vary the terms of the APA in any way that could nullify, modify, impair or otherwise affect the requirements set forth in (1) through (4) above.

c.    Counsel for the Debtors shall promptly provide copies of any bids that he receives to the Stalking Horse Bidder and the Official Committee of Unsecured Creditors. Any party in interest (including the Stalking Horse Bidder) shall have standing to challenge any prospective bidder's compliance with these qualification requirements. Any dispute regarding a prospective bidder's compliance with these qualification requirements shall be resolved by the Bankruptcy Court.

d.    The Stalking Horse Bid shall be considered the opening bid ("Opening Bid") at the auction. For all purposes of these bidding procedures and the auction contemplated herein, including, without, limitation, the determination of the Successful Bidder, the Opening Bid shall be valued at an amount equal to the sum of one million nine-hundred fifty thousand dollars ($1,950,000).

e.    The highest Over Bid submitted by a Qualified Bidder shall be the initial over-bid at the auction ("Initial Over-Bid"). **Subsequent over-bids ("Subsequent Over-Bids") shall be in increments of not less than $250,000 higher than the immediately preceding bid**. The Initial Over-Bid and Subsequent Over-Bids shall be on substantially the same or better terms and conditions, taken as a whole, as those set forth in the Stalking Horse Bid. In determining the amount of any Subsequent Over-Bid submitted by the Stalking Horse Bidder, Debtors shall take into account, and the Stalking Horse Bidder shall be entitled to a credit equal to, the amount of the Break-Up Fee.

f.    All bids shall be made in the presence of other bidders. Bidders shall have the right to request reasonable breaks during the pendency of the auction which the Debtors shall comply with.

g.    Upon the conclusion of the bidding, Debtors shall announce their determination as to which bidder has submitted the highest and best bid ("Successful Bid"), and such bidder shall be declared the successful bidder ("Successful Bidder"). The Successful Bid, as determined by Debtors in accordance with these Bidding Procedures, shall be submitted to the

MOTION FOR APPROVAL OF: (i) SALE...OF SUBSTANTIALLY ALL OF DEBTORS' ASSETS ...FREE AND CLEAR OF LIENS; (ii) BIDDING, NOTICE AND SALE PROCEDURES; (iii) ASSUMPTION AND ASSIGNMENT OF CONTRACTS; (iv) REJECTION OF CERTAIN CONTRACTS; AND (vi) ADDITIONAL RELIEF - 11

#753779 v2 / 43827-002

*Law Offices*
KARR TUTTLE CAMPBELL
*A Professional Service Corporation*
1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

Bankruptcy Court for approval at the Sale Hearing. Within two (2) business days of the declaration of the Successful Bidder, the deposits of all unsuccessful bidders shall be refunded with any accrued interest.

h.   The transaction evidenced by the Successful Bid shall close not later than 30 days following the entry of the Sale Order ("Outside Closing Date") at which time the Successful Bidder shall pay the Successful Bid amount less the amount of the deposit to the Debtors on the Closing Date into the Escrow Account; provided, however, if the Stalking Horse Bidder is declared the Successful Bidder such date may be extended pursuant to the terms of the APA executed by the Stalking Horse Bidder.

i.   The Successful Bidder shall, at its expense, obtain all necessary governmental licenses, permits and approvals necessary to the consummation of its proposed transaction (provided, however, that this provision does not change any provision of the APA or any bid regarding allocation of responsibility to pay taxes of Sellers).

j.   In the event Buyer is not the Successful Bidder and Debtors consummate an Alternative Transaction, Buyer shall be entitled to receive from Debtors' bankruptcy estate upon the consummation of such Alternative Transaction a cash break-up fee payment in the amount of **$250,000** for the reimbursement of Buyer's reasonable and actual expenses incurred in connection with the proposed transactions contemplated by the APA (the "Break-Up Fee"). The Break-Up Fee shall be paid at the closing of the Alternative Transaction and shall be paid concurrently or ahead of any other distributions or payments to any Seller contemplated in connection with such Alternative Transaction by the Successful Bidder. The Break-Up Fee shall constitute an administrative expense of Debtors under Sections 503(b) and 507(a)(1) of the Bankruptcy Code. If Buyer is the Successful Bidder and Buyer breaches its obligations under the APA without having its performance excused under the terms of the APA, it shall not be entitled to receive the Break-Up Fee if a sale of some or all of the Acquired Assets is closed with another party.

k.   In the event a bidder is declared to be the Successful Bidder and such bidder fails to timely perform any of its obligations as set forth above or pursuant to the Bankruptcy Court approved definitive agreements, such declared Successful Bidder shall forfeit all deposits made to the extent provided in such definitive agreements or for failure to enter into such definitive agreement if a bidder other than the Buyer without regard to Sellers' ultimate damages occasioned by such failure; such deposits shall not constitute liquidated damages; and, notwithstanding the foregoing, Debtors and the bankruptcy

MOTION FOR APPROVAL OF: (i) SALE…OF SUBSTANTIALLY ALL OF
DEBTORS' ASSETS …FREE AND CLEAR OF LIENS; (ii) BIDDING,
NOTICE AND SALE PROCEDURES; (iii) ASSUMPTION AND
ASSIGNMENT OF CONTRACTS; (iv) REJECTION OF CERTAIN
CONTRACTS; AND  (vi) ADDITIONAL RELIEF - 12
#753779 v2 / 43827-002

*Law Offices*
KARR TUTTLE CAMPBELL
*A Professional Service Corporation*
1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

estates shall retain all rights, remedies, claims, counterclaims, and defenses, including the right to seek equitable or injunctive relief. In such an event the Debtors shall be free to treat the next highest and best bid received as the Successful Bid without further Court approval.

l.    Debtors shall give not less than twenty-four (24) days written notice to all parties in interest in the case, including all Persons which have asserted liens on or security interests in any of the Acquired Assets, all non-debtor parties to the Assumed Executory Contracts and all known prospective bidders of the date, time and location of the Sale Hearing, unless the Bankruptcy Court enters an order allowing the Sale Hearing to proceed on less notice.

m.    In the event Debtors are unable to obtain Court approval of the Sale Motion, the sole remedy of any bidder shall be of the return of its deposit except, with respect to Buyer, as otherwise provided in the APA with respect to the Break-Up Fee.

n.    All bids shall (i) be all cash as to amounts payable for the Acquired Assets exclusive of any amounts designated for post-closing investment by any Successful Bidder, or (ii) cash in an amount necessary to pay the undisputed claims of creditors in full, together with a non-cash component in excess of such amount.

The proposed Bidding Procedures are in the best interests of Debtors, their creditors, and their estates. The Bidding Procedures are designed to strike a balance between inviting competing bids and enabling Debtors to close a sale with Buyer within a reasonable time frame. The Bidding Procedures thus are fair, reasonable and necessary to promote the highest and best sale price, without imposing undue obstacles to the competitive bid process. Moreover, debtors often employ bidding protections in order to encourage the making of an original offer subject to higher and/or better offers and ultimately to increase value for the estate.

Here, the Break-Up Fee is an integral part of Buyer's offer. In fact, Buyer's offer to purchase the Acquired Assets was – and remains – predicated and conditioned upon, inter alia, this Court's approval of the Break-Up Fee. As such, the assurance of the Break-Up Fee has "promoted

*Law Offices*
KARR TUTTLE CAMPBELL
*A Professional Service Corporation*
1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

more competitive bidding" because it induced a bid from Buyer, which is higher and better than any other bids received by the Debtors, that otherwise might not have been made. Debtors submit that Buyer should be reasonably reimbursed for its willingness to assume the role of the "stalking horse" as all parties willing to serve in such role are also requesting Break-Up Fees of similar magnitude. Moreover, Buyer's offer (including the Break-Up Fee) is also likely to serve as a catalyst to higher bids. Accordingly, Debtors respectfully submit that this Court should authorize and approve the Bidding Procedures, including the Break-Up Fee.

## IV. LEGAL ANALYSIS

### A. Conducting a Public Auction Pursuant to the Bidding Procedures Is in the Best Interests of the Estate and Its Creditors

By this Motion, Debtors seek approval of the Proposed Asset Sale, free and clear of liens and encumbrances, as further detailed above and in the APA, subject to higher or better offers.

**1. Bankruptcy Code § 363.** Section 363(b) of the Bankruptcy Code authorizes a debtor to sell its assets outside of the ordinary course of business. A debtor must show that each of the following elements has been met: (i) a sound business reason exists for the proposed transaction; (ii) the sale has been proposed in good faith; (iii) the sale price is fair and reasonable; and (iv) accurate and reasonable notice has been provided of the transaction.[3] Here, the proposed sale of the Acquired Assets pursuant to the APA meets each of these four factors.

**2. The Proposed Sale Is Supported by Sound Business Reasons.** Based upon their analysis of their existing and future business prospects, the Debtors have concluded that, given their

---

[3] *In re Country Manor of Kenton, Inc.*, 172 B.R. 217, 220-21 (Bankr. N.D. Ohio 1994); *In re Stroud Ford, Inc.*, 163 B.R. 730 (Bankr. M.D. Pa. 1993); *In re Plabell Rubber Prods., Inc.*, 149 B.R. 475, 479 (Bankr. N.D. Ohio 1992); *In re George Walsh Chevrolet, Inc.*, 118 B.R. 99, 102 (Bankr. E.D. Mo. 1990).

*Law Offices*
KARR TUTTLE CAMPBELL
*A Professional Service Corporation*
1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

current situation and the absence of a source of capital for investing in long-term operations, the Proposed Asset Sale represents the only viable way to maximize the value of Debtors' estates for the benefit of all creditors.

The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate. *See, e.g., Four B. Corp. v. Food Barn Stores, Inc.*, 107 F.3d 558, 564-65 (8th Cir. 1997) (stating that, in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand"); *In re Integrated Res., Inc.*, 147 B.R. 650, 659 (S.D.N.Y. 1992) ("It is a well-established principle of bankruptcy law that the objective of bankruptcy rules and the Debtors' duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate."). To that end, courts uniformly recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and are appropriate in the context of bankruptcy sales. *See In re Integrated Res., Inc.*, 147 B.R. at 659 (sales procedures should "encourage bidding and maximize the value of the Debtors' assets").

Here, the proposed Bidding Procedures will allow and encourage interested parties to submit competing bids in an Auction, thereby maximizing the value that the Debtors will receive for their assets. The Debtors believe that the Auction process will allow them to determine the highest and best price possible for their assets. Without a prompt sale, the value of the Debtors as a going concern will significantly diminish because of the Debtors' cash flow difficulties.

The Debtors further submit that the Proposed Asset Sale will preserve the substantial goodwill of Debtors' Business, maintain valuable relationships with its franchisees and customers,

*Law Offices*
KARR TUTTLE CAMPBELL
*A Professional Service Corporation*
1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

preserve jobs, and avoid a liquidation sale of Debtors' assets at severely depressed, "fire-sale" prices. Thus, Debtors believe that the Proposed Asset Sale will realize the most cash possible for Debtors' estate and creditors.

**3.     The Sale has Been Proposed in Good Faith.**   "The requirement that a Buyer act in good faith ... speaks to the integrity of his conduct in the course of the sale proceedings."  *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143, 147 (3d Cir. 1986).   "Typically, the misconduct that would destroy a Buyer's good faith status at a judicial sale involves fraud, collusion between the Buyer and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders." *Id.*

Here, the APA is the result of protracted, arm's length negotiations between Debtors and Buyer, and their respective advisors.   Buyer thus is a good faith Buyer within the meaning of Section 363(m) of the Bankruptcy Code and should be entitled to all of the protections thereof.

Additionally, the sale of the Acquired Assets is subject to higher or better offers and Debtors intend to provide notice of the Proposed Asset Sale to all potential bidders as more fully discussed below.   Finally, Debtors have fully disclosed, and are requesting herein the Court's approval of, all of the terms and conditions of the proposed sale, notice and bidding procedures.   Accordingly, the sale of the Acquired Assets has been proposed, and is, in good faith.

**4.     The Purchase Price is Fair and Reasonable.**   The Debtors sought higher or better offers from other potential buyers prior to commencement of this Chapter 11 case and the filing of this Motion.   Based upon those efforts, Debtors believe that the Purchase Price is fair and reasonable, is the highest and best offer received (as opposed to expressions of interest from parties

MOTION FOR APPROVAL OF: (i) SALE…OF SUBSTANTIALLY ALL OF DEBTORS' ASSETS …FREE AND CLEAR OF LIENS; (ii) BIDDING, NOTICE AND SALE PROCEDURES; (iii) ASSUMPTION AND ASSIGNMENT OF CONTRACTS; (iv) REJECTION OF CERTAIN CONTRACTS; AND  (vi) ADDITIONAL RELIEF - 16

#753779 v2 / 43827-002

*Law Offices*
KARR TUTTLE CAMPBELL
*A Professional Service Corporation*
1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

for higher dollar amounts previously received) to date for the Acquired Assets, and that the likely alternative to the Proposed Asset Sale is a forced liquidation, with a resultant loss of substantial value to the Debtors' estates.

Further, the Debtors submit that the payment of the Break-Up Fee in the event of an Alternative Transaction is fair and reasonable. Buyer has incurred and will continue to incur costs in continuing to make its offer available to Debtors. If another bidder appears and pays substantially more than Buyer's offer, the Debtors will reap the benefits of Buyer's first offer allowing for a higher subsequent offer. Indeed, courts have recognized that such fees are often a key component to significant sales conducted under section 363 of the Bankruptcy Code. *See In re Integrated Res., Inc.*, 147 B.R. at 659-60 ("Break-up fees are important tools to encourage bidding and to maximize the value of the debtor's assets … In fact, because the … corporation ha[s] a duty to encourage bidding, break-up fees can be necessary to discharge [such] duties to maximize values."). Here, the Break-Up Fee reasonably relates to Buyer's "risk, effort and expenses …", *In re Integrated Res., Inc.*, 147 B.R. at 662, was the result of arms-length negotiations, *In re 955 5th Avenue Associates*, 96 B.R. 24 (Bankr. S.D.N.Y. 1989) and encourages bidding. *Id.* at 28. Thus, the Break-Up Fee should be approved and allowed in the event of an Alternative Transaction.

**5. The Requirements of 11 U.S.C. § 363(f).** Section 363(f) of the Bankruptcy Code provides:

(f)     The Trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if –

(1)     applicable non-bankruptcy law permits sale of such property free and clear of such interest;

(2)     such entity consents;

*Law Offices*
KARR TUTTLE CAMPBELL
*A Professional Service Corporation*
1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

      (3)     such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

      (4)     such interest is in bona fide dispute; or

      (5)     such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

First, the Claims Bar Date set for filing proofs of claim in this case was April 15, 2010, and as of that date the aggregate amount of secured claims totals just under $600,000. The Debtors expect that the actual present amount of secured claims to be approved by the Court will be a bit less than this amount. In either event, all approved secured claims will be paid in full out of proceeds from the Proposed Asset Sale. To the extent that there are additional claims or amounts due and secured by the Acquired Assets, any liens on such assets shall also attach to the proceeds from the Proposed Asset Sale.

Thus, the Debtors submit that the transfer of the Acquired Assets free and clear of any liens, claims, interests, and encumbrances satisfies the statutory prerequisites of Section 363(f) of the Bankruptcy Code. Accordingly, Debtors seek the entry of a Sale Order authorizing the sale of the Acquired Assets pursuant to Section 363.

**B.**      <u>Assumption and Assignment Contracts and Leases Pursuant to 11 U.S.C. § 365</u>

Section 365(a) of the Bankruptcy Code governs assumption of unexpired leases and other executory contracts and provides that, "[t]he trustee, subject to the court's approval, may assume or reject any executory contracts or unexpired lease of Debtor."

*Law Offices*
KARR TUTTLE CAMPBELL
*A Professional Service Corporation*
1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

**Section 365(f) of the Bankruptcy Code provides, in pertinent part, that:**

> (2)     The trustee may assign an executory contract or unexpired lease of the debtor only if –
>
> > (A)     the trustee assumes such contract or lease in accordance with the provisions of this section; and
> >
> > (B)     adequate assurance of future performance by the assignee of such contact or lease is provided, whether or not there has been a default in such a contract or lease.

11 U.S.C. § 365(f)(2).

The Debtors' proposed assumption and assignment of the Assumed Executory Contracts is a proper exercise of Debtors' business judgment as part of an integral component of this negotiated Proposed Asset Sale, moreover the contracts to be assumed will avoid rejection damages that would likely dilute amounts to ultimately go to the class of unsecured creditors. Additionally, Buyer has represented that it is a competent, financially stable assignee. Therefore, it is respectfully submitted that Debtors may assume and assign the Assumed Executory Contracts under Section 365 of the Bankruptcy Code. Debtors plan to bring a separate motion to assume and reject contracts which shall be conditioned upon closing of the Proposed Asset Sale, and such motion shall include disclosure of the specific executory contracts to be assumed.

**C.      The Successful Bidder Is Entitled to Good Faith Purchaser Status Pursuant to Section 363(m) of the Bankruptcy Code.**

The Debtors request that the Court find that the Successful Bidder is qualified to acquire the Assets and will do so in good faith within the meaning of Bankruptcy Code section 363(m). Specifically, section 363(m) provides that "[t]he reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such

MOTION FOR APPROVAL OF: (i) SALE…OF SUBSTANTIALLY ALL OF
DEBTORS' ASSETS …FREE AND CLEAR OF LIENS; (ii) BIDDING,
NOTICE AND SALE PROCEDURES; (iii) ASSUMPTION AND
ASSIGNMENT OF CONTRACTS; (iv) REJECTION OF CERTAIN
CONTRACTS; AND  (vi) ADDITIONAL RELIEF - 19
#753779 v2 / 43827-002

*Law Offices*
KARR TUTTLE CAMPBELL
*A Professional Service Corporation*
1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

property in good faith …."  11 U.S.C. § 363(m).  Thus, pursuant to this section, "an appeal of a bankruptcy court's ruling on a foreclosure action [or sale] generally cannot affect the rights of a good faith purchaser of the foreclosed property."  *Mann v. Alexander Dawson, Inc.*, 907 F.2d 923, 926 (9th Cir. 1990).

Here, Buyer needs assurance that the purchase of the Acquired Assets will not be subject to future attack by objecting creditors, if any.  Such assurance, Debtors believe, is required to generate the maximum purchase price for such assets at the Sale Hearing.  Further, these circumstances warrant a finding of good faith on the part of Buyer.  Lack of good faith is generally determined by the existence of fraudulent conduct or insider dealing during the sale process.  *See In re Exennium, Inc.*, 715 F.2d 1401 (9th Cir. 1983).  Here, no such fraudulent conduct or dealings have occurred as of the date of this Sale Motion and will not occur prior to the Sale Hearing.  Further, the Proposed Sale here will be the product of an open auction in Court and to the extent necessary, arms-length, good faith negotiations between the Debtors, on the one hand, and the successful bidder, on the other.

## V.  PROPOSED NOTICE OF PROPOSED ASSET SALE AND PROCEDURES

In order to ensure broad dissemination of notice of the Proposed Asset Sale, the Sale Hearing, and the Bidding Procedures, upon entry of the Sale Procedures Order, Debtors propose to serve (a) the Sale Procedures Order and the proposed notice of sale ("Notice of Sale") attached hereto as Exhibit B on all creditors, equity holders and prospective bidders (or their counsel) that are known to the Debtors and their advisors and (b) the Notice of Sale and the Sale Motion on (i) the Office of the United States Trustee; (ii) counsel to the Official Committee of Unsecured Creditors;

MOTION FOR APPROVAL OF: (i) SALE…OF SUBSTANTIALLY ALL OF DEBTORS' ASSETS …FREE AND CLEAR OF LIENS; (ii) BIDDING, NOTICE AND SALE PROCEDURES; (iii) ASSUMPTION AND ASSIGNMENT OF CONTRACTS; (iv) REJECTION OF CERTAIN CONTRACTS; AND  (vi) ADDITIONAL RELIEF - 20
#753779 v2 / 43827-002

*Law Offices*
KARR TUTTLE CAMPBELL
*A Professional Service Corporation*
1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

(iii) the local, state and federal taxing authorities for each jurisdiction in which the Purchased Assets are located; (iv) counsel to the Proposed Buyer; (v) all parties known to the Debtors to have or to assert any lien, claim, Encumbrance or other interest in any of the Acquired Assets; (vi) the Office of the United States Attorney; (vii) the Attorney General for the State of Washington; and (viii) all persons who have filed requests for notice in these chapter 11 cases.

The Debtors respectfully submit that such notice of the sale of the Acquired Assets satisfies the notice requirements of the applicable Bankruptcy Rules and § 363(b) of the Bankruptcy Code, constitutes good and sufficient notice, and that no other or further notice of this Motion, the Proposed Asset Sale, and the APA is required.

## VI. CONCLUSION

Based on the foregoing, the Debtors respectfully request that this Court (i) at the conclusion of the initial hearing on the Sale Motion, (a) enter the Sale Procedures Order substantially in the form filed concurrently herewith, and (b) approve the forms of the Sale/Bidding Procedures and the Notice of Sale attached as exhibits to the Sale Procedures Order; (ii) at the conclusion of the Sale Hearing, enter the Sale Order substantially in the form attached hereto as Exhibit A; and (iii) grant such additional relief as requested herein.

DATED this 30th day of July, 2010.

KARR TUTTLE CAMPBELL

By: _____
George S. Treperinas, WSBA #15434
Attorneys for Debtors-in-Possession
Taco Del Mar Franchising Corp. and
Conrad & Barry Investments, Inc.

MOTION FOR APPROVAL OF: (i) SALE...OF SUBSTANTIALLY ALL OF DEBTORS' ASSETS ...FREE AND CLEAR OF LIENS; (ii) BIDDING, NOTICE AND SALE PROCEDURES; (iii) ASSUMPTION AND ASSIGNMENT OF CONTRACTS; (iv) REJECTION OF CERTAIN CONTRACTS; AND (vi) ADDITIONAL RELIEF - 21

#753779 v2 / 43827-002

*Law Offices*
KARR TUTTLE CAMPBELL
*A Professional Service Corporation*
1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100