UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

| | |
|---|---|
| In re | Case No. 10-10528-KAO |
| TACO DEL MAR FRANCHISING CORP.<br>EIN: 91-1723173, | DEBTOR'S DISCLOSURE STATEMENT<br>FOR PLAN OF LIQUIDATION |
| Debtor. | |

THIS DISCLOSURE STATEMENT (THE "DISCLOSURE STATEMENT"), WHICH IS FILED IN SUPPORT OF THE PLAN OF LIQUIDATION (THE "PLAN") PROPOSED BY TACO DEL MAR FRANCHISING CORP. ("TDM," THE "DEBTOR" OR THE "PLAN PROPONENT") WHICH IS BASED ON THE DEBTOR'S FINANCIAL, OPERATIONAL, ADMINISTRATIVE, CLAIM AND BACKGROUND INFORMATION, NONE OF WHICH IS HAS BEEN AUDITED AT ANY TIME SHORTLY PRIOR TO OR AFTER THE PETITION DATE, AND AS A RESULT, DEBTOR MAKES NO REPRESENTATIONS OR ASSURANCES AS TO THE ACCURACY OF SUCH INFORMATION.

ALL CREDITORS AND HOLDERS OF EQUITY INTERESTS ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY AND SHOULD RELY ON THEIR OWN COUNSEL AND ADVISERS IN EVALUATING THEM. PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT, INCLUDING THE FOLLOWING SUMMARY, ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN, EXHIBITS ANNEXED TO THE PLAN, THE PLAN SUPPLEMENT, THIS DISCLOSURE STATEMENT AND ALL EXHIBITS TO THIS DISCLOSURE STATEMENT. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF UNLESS OTHERWISE SPECIFIED, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN ARE CORRECT OR WILL BE CORRECT AT ANY TIME AFTER SUCH DATE IN THAT THE INFORMATION IS

DERIVED FROM THE DEBTOR'S AND OTHER PARTIES' FILINGS WITH THE COURT, WHICH THE PLAN PROPONENT HAS NOT INDEPENDENTLY VERIFIED. THOSE THAT ARE ENTITLED TO VOTE ON THE PLAN SHOULD READ CAREFULLY THE "RISK FACTORS" SECTION HEREOF BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. SEE ARTICLE VIII BELOW, "CERTAIN RISK FACTORS TO BE CONSIDERED."

THE PLAN PROPONENTS BELIEVE THAT THE PLAN WILL EFFECT AN ORDERLY LIQUIDATION OF THE DEBTOR'S ESTATE AND ACCOMPLISH THE OBJECTIVES OF CHAPTER 11 AND THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTERESTS OF THE DEBTOR AND ITS CREDITORS. THE PLAN PROPONENT URGES ALL THOSE ENTITLED TO VOTE TO ACCEPT THE PLAN.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER APPLICABLE LAW. THIS DISCLOSURE STATEMENT HAS BEEN NEITHER APPROVED NOR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC") NOR HAS THE SEC PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN. PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING, OR TRANSFERRING CLAIMS OR EQUITY INTERESTS IN THE DEBTORS SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSES FOR WHICH THEY WERE PREPARED.

THE INFORMATION IN THIS DISCLOSURE STATEMENT IS BEING PROVIDED SOLELY FOR PURPOSES OF VOTING TO ACCEPT OR REJECT THE PLAN. NOTHING IN THIS DISCLOSURE STATEMENT MAY BE USED BY ANY ENTITY FOR ANY OTHER PURPOSE.

THE TERMS OF THE PLAN GOVERN IN THE EVENT OF ANY INCONSISTENCY BETWEEN THE PLAN AND THIS DISCLOSURE STATEMENT. ALL EXHIBITS TO THIS DISCLOSURE STATEMENT ARE INCORPORATED INTO AND ARE A PART OF THIS DISCLOSURE STATEMENT AS IF SET FORTH IN FULL HEREIN.

AS TO CONTESTED MATTERS, EXISTING LITIGATION INVOLVING, OR POSSIBLE ADDITIONAL LITIGATION TO BE BROUGHT BY, OR AGAINST, THE DEBTOR, ADVERSARY PROCEEDINGS, AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, A STIPULATION, OR A WAIVER, BUT RATHER AS A STATEMENT MADE WITHOUT PREJUDICE SOLELY FOR SETTLEMENT PURPOSES, WITH FULL RESERVATION OF RIGHTS, AND IS NOT TO BE USED FOR ANY LITIGATION PURPOSE WHATSOEVER BY ANY PERSON, PARTY OR ENTITY. AS SUCH, THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NONBANKRUPTCY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PARTY IN INTEREST, NOR SHALL IT BE CONSTRUED TO BE

CONCLUSIVE ADVICE ON THE TAX, SECURITIES, FINANCIAL OR OTHER EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST OR EQUITY INTERESTS IN THE DEBTORS.

All capitalized terms used herein and not otherwise defined shall have the meanings ascribed to them in the Plan.

# I.
# INTRODUCTION

On January 22, 2010, the Debtor and its parent corporation Conrad & Barry Investments, Inc. ("CBI") filed their respective petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Western District of Washington at Seattle. This Plan only relates to the Debtor and not CBI.

The Debtor, in consultation with its legal and financial advisors, has concluded that recoveries to Creditors will be maximized by liquidation of remaining unliquidated assets of the Debtor (if any) and distribution by the Debtor without a Chapter 11 plan. In light of the efforts of the Official Committee Of Unsecured Creditors ("Committee") to require that a liquidation plan be confirmed to accomplish the remaining administration of the Estate, the Debtor proposed that any Chapter 11 plan which is confirmed appoint the Reorganized Debtor either outright or as Plan Agent to administer the plan, including as follows:

- upon the occurrence of the Effective Date, paying in full in Cash Allowed (a) Administrative Claims, (b) Priority Tax Claims, and (c) Other Priority Claims;

- with respect to each Allowed Class 1 Secured Claim (if any) which remains unpaid, at the sole option of the Plan Agent, either (a) reinstating and rendering unimpaired such Secured Claim, (b) paying such Secured Claim in full in Cash, or (c) distributing Collateral securing such Allowed Secured Claim to the holder thereof;

- payment to each Allowed Class 2 Convenience Claim (General Unsecured Claims of $1,500 or less) its Pro Rata share of a special $100,000 fund;

- payment to each Allowed Class 3 General Unsecured Claim its Pro Rata share of the Estate that remains after payment of certain Administrative Claims, Priority Tax Claims, Other Priority Claims, Secured Claims, Convenience Claims, and the fees and expenses of the Plan Agent; and

- making no distribution to any holders of Class 4 Equity Interests.

As is described more fully below, the Plan Proponent estimates that the implementation of the Plan will result in prompt recoveries of 100% of the Allowed Claims in Class 1, recoveries of up to 100% in Class 2, and a recovery ranging from 2% to 12% to Class 3. Holders of Equity Interest will receive nothing, and Equity Interests will be extinguished.

This Disclosure Statement is submitted, pursuant to section 1125 of the Bankruptcy Code, to holders of Claims that are entitled to vote on the Plan in connection with (i) the solicitation of acceptances of the Plan and (ii) the hearing to consider confirmation of the Plan scheduled for April 29, 2011, at 9:30 a.m. prevailing Pacific Time (the "Confirmation Hearing").

Attached as Exhibits to this Disclosure Statement are copies of the following:

- The Plan (Exhibit A); and

- An Order of the Court (excluding the exhibits thereto) dated March ___, 2011 (the "Disclosure Statement Order"), among other things, approving this Disclosure Statement and establishing certain procedures with respect to the solicitation and tabulation of votes to accept or reject the Plan (Exhibit B).

A Ballot for, among other things, the acceptance or rejection of the Plan, is enclosed with this Disclosure Statement for those holders of Claims that are entitled to vote to accept or reject the Plan. Classes 1, 2, and 3 are entitled to vote; Class 4 is not. The voting results will be reported to the Bankruptcy Court.

Pursuant to the Disclosure Statement Order, after notice and a hearing, the Court determined that this Disclosure Statement contains "adequate information" as that term is defined in section 1125 of the Bankruptcy Code. Section 1125(a)(1) of the Bankruptcy Code defines "adequate information" as "information of a kind and in sufficient detail, as far as is reasonably practicable in light of the nature and the history of the debtor and the condition of the debtor's books and records, that would enable a hypothetical reasonable investor typical of holders of claims or interests of the relevant class to make an informed judgment about the plan." NO STATEMENTS OR INFORMATION CONCERNING THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY HAVE BEEN AUTHORIZED OTHER THAN THE STATEMENTS AND INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AND THE INFORMATION ACCOMPANYING THIS DISCLOSURE STATEMENT. ALL OTHER STATEMENTS REGARDING THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY, WHETHER WRITTEN OR ORAL, ARE UNAUTHORIZED.

**APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT, HOWEVER, CONSTITUTE A DETERMINATION BY THE COURT AS TO THE FAIRNESS OR MERITS OF THE PLAN.**

The Disclosure Statement Order sets forth in detail (a) the deadlines, procedures and instructions for (i) voting to accept or reject the Plan and (ii) filing objections to confirmation of the Plan, (b) the record date for voting purposes, and (c) the applicable standards for tabulating Ballots. In addition, detailed voting instructions accompany each Ballot. Each holder of a Claim that is entitled to vote on the Plan should read in their entirety this Disclosure Statement, the Plan, the Disclosure Statement Order and the instructions accompanying the

Ballots before voting on the Plan. These documents contain, among other things, important information concerning the classification of Claims and Interests for voting purposes and the tabulation of votes. No solicitation of votes to accept the Plan may be made except pursuant to section 1125 of the Bankruptcy Code.

### A. Holders of Claims and Interests Entitled to Vote.

Pursuant to the provisions of the Bankruptcy Code, only holders of allowed claims or equity interests in classes of claims or equity interests that are impaired are entitled to vote to accept or reject a proposed Chapter 11 plan. Classes of claims or equity interests in which the holders of claims or equity interests are unimpaired under a Chapter 11 plan are deemed to have accepted the plan and are not entitled to vote to accept or reject the plan. Classes of claims or equity interests in which the holders of claims or equity interests are not entitled to receive or retain any property on account of such claims or equity interests are deemed to have rejected the plan and are not entitled to vote to accept or reject the plan.

Class 1 (Secured Claims), Class 2 (Convenience Claims), and Class 3 (General Unsecured Claims) are or may be Impaired and may vote to accept or reject the Plan. BALLOTS TO ACCEPT OR REJECT THE PLAN ARE BEING PROVIDED ONLY TO HOLDERS OF CLAIMS IN CLASSES 1, 2, AND 3. Holders of Class 4 Equity Interests also are Impaired and will receive no Distribution under the Plan. Accordingly, they are deemed not to have accepted the Plan and will not receive Ballots. The Bankruptcy Code defines "acceptance" of a plan by (i) a class of claims, as acceptance by creditors in that class that hold at least two-thirds in dollar amount and represent more than one-half in number of the claims that cast ballots for acceptance or rejection of the plan and (ii) a class of interests, as acceptance by holders of such interests in that class that hold at least two-thirds in amount that cast ballots for acceptance or rejection of the plan. For a more detailed description of the requirements for confirmation of the Plan, see Section VII.O below and Article XIV of the Plan.

In the event that Class 1, 2, or 3 votes to accept the Plan, section 1129(b) of the Bankruptcy Code permits the Court to confirm a plan of reorganization notwithstanding the nonacceptance of a plan by one or more Impaired Classes of Claims. Under that section, a plan may be confirmed if it does not "discriminate unfairly" and is "fair and equitable" with respect to each nonaccepting class. For a more detailed description of the requirements for confirmation of a nonconsensual plan, *see* Section IX.C below.

For a summary of the treatment of each Class of Claims and Interests, see Article II below.

### B. Voting Procedures.

If you are entitled to vote to accept or reject the Plan, a Ballot is enclosed for the purpose of voting on the Plan.

Please vote and return your Ballot(s) directly to the following address:

Karr Tuttle Campbell LLP
1201 Third Avenue
Suite 2900
Seattle, Washington 98101
Attn: Marti Munhall

TO BE COUNTED OR TO EXERCISE ANY ELECTIONS PROVIDED ON SUCH BALLOT, YOUR BALLOT(S) INDICATING ACCEPTANCE OR REJECTION OF THE PLAN OR THE EXERCISE OF ANY ELECTIONS MUST BE ACTUALLY RECEIVED NO LATER THAN 5:00 P.M., PREVAILING PACIFIC TIME, ON APRIL 22, 2011 (the "Voting Deadline").

Pursuant to the Disclosure Statement Order, the Court set March 18, 2011 at 5:00 p.m. prevailing Pacific Time, as the record date (the "Voting Record Date") for voting on the Plan. Accordingly, only holders of record as of the Voting Record Date that are otherwise entitled to vote under the Plan will receive a Ballot and may vote on the Plan.

If you are a holder of a Claim entitled to vote on the Plan and did not receive a Ballot, received a damaged Ballot, or lost your Ballot, or if you have any questions concerning the procedures for voting on the Plan, please call or contact the Debtor's attorneys at Karr Tuttle Campbell, c/o Marti Munhall (mmunhall@karrtuttle.com) or by phone at (206) 223-1313).

**C.    Confirmation Hearing.**

Pursuant to section 1128 of the Bankruptcy Code, the Confirmation Hearing to consider confirmation of the Plan is scheduled for April 29, 2011 at 9:30 a.m., prevailing Pacific Time, before the Honorable Karen A. Overstreet, United States Bankruptcy Court for the Western District of Washington at Seattle, United States Courthouse, 700 Stewart Street, Room 7206, Seattle, Washington 98101. The Court has directed that objections, if any, to confirmation of the Plan be served and filed so that they are received on or before April 22, 2011 at 5:00 p.m., prevailing Pacific Time, in the manner described in Section IX.B below. The Confirmation Hearing may be adjourned from time to time by the Court without further notice except for the announcement of the adjournment date made at the Confirmation Hearing or at any subsequent adjourned Confirmation Hearing.

**II.**
**OVERVIEW OF THE PLAN**

The following table briefly summarizes the classification and treatment of Claims and Equity Interests under the Plan and the estimated distributions to be received by the holders of Allowed Claims and Equity Interests thereunder. This table is only a summary of the classification and treatment of Claims and Equity Interests under the Plan. This Disclosure Statement and the Plan should be reviewed in their entirety for a complete description of the classification and treatment of Claims and Equity Interests.

Information in the Disclosure Statement, including estimates of the amount of Claims in each Class are based on historical and financial documents in the Debtor's and other parties' filings with the Court and on the Plan Proponent's review of the Schedules proofs of Claim filed in this Chapter 11 Case. The Plan Proponent has not independently verified the information, and it is not audited. Such estimates, while constituting the Plan Proponent's best business judgment, may be materially higher or lower than the amount of Claims in any Class that is actually Allowed and, consequently, the estimated recovery to Creditors in any Class may be different than those projected herein.

### SUMMARY OF CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS UNDER THE PLAN

| Class | Type of Claim or Equity Interest | Treatment | Estimated Amount | Impairment | Estimated Recovery |
|---|---|---|---|---|---|
| N/A | Administrative Claims, including Allowed Claims Pursuant to § 503(b)(9) of the Bankruptcy Code | Each holder of an Allowed Administrative Claim shall receive, in full satisfaction, settlement, release, and discharge of and in exchange for such Claims, (a) Cash in the amount of such Allowed Administrative Claim on the later of the Initial Distribution Date or the date such Administrative Claim becomes an Allowed Administrative Claim or within five (5) Business Days thereafter, or (b) such other treatment as the Plan Agent and such holder shall have agreed upon. All Allowed Administrative Claims shall be paid from the assets of the Estate. | $200,000.00 | Unimpaired | 100%<br><br>(mainly anticipated professional fees for Debtor, Committee and Plan Agent) |

| Class | Type of Claim or Equity Interest | Treatment | Estimated Amount | Impairment | Estimated Recovery |
|---|---|---|---|---|---|
| N/A | Priority Tax Claims | Except to the extent that a holder of an Allowed Priority Tax Claim and the Plan Proponent or the Plan Agent agree to a different treatment, each holder of an Allowed Priority Tax Claim shall be paid from the Estate, in full satisfaction, settlement, release, and discharge of and in exchange for such Claim, in full in Cash on, or as soon as practicable thereafter, the later of the Effective Date or the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim. Allowed Priority Tax Claims shall be paid from the assets of the Estate. | $300,000.00 | Unimpaired | 100% |
| N/A | Other Priority Claims | Except to the extent that a holder of an Other Priority Claim and the Plan Proponent or the Plan Agent agree to a different treatment, each holder of an Allowed Other Priority Claim shall receive, in full satisfaction, settlement, release, and discharge of and in exchange for such Claims from the Estate, payment in full in Cash in an amount equal to such Allowed Other Priority Claim on or as soon as practicable after the later of the Effective Date or the date when such Other Priority Claim becomes an Allowed Other Priority Claim. | $0.00 | Unimpaired | 100% |

| Class | Type of Claim or Equity Interest | Treatment | Estimated Amount | Impairment | Estimated Recovery |
|---|---|---|---|---|---|
| 1 | Secured Claims | Except to the extent that a holder of an Allowed Class 1 Secured Claim and the Plan Proponent or the Plan Agent agree to a different treatment, in full satisfaction, settlement, release, and discharge of and in exchange for such Claim, at the sole option of the Plan Agent, (i) each Allowed Class 1 Secured Claim shall be reinstated and rendered unimpaired in accordance with section 1124(2) of the Bankruptcy Code, notwithstanding any contractual provision or applicable nonbankruptcy law that entitles the holder of an Allowed Class 1 Secured Claim to demand or to receive payment of such Allowed Class 1 Secured Claim prior to the stated maturity of such Allowed Class 1 Secured Claim from and after the occurrence of a default, (ii) each holder of an Allowed Class 1 Secured Claim shall receive Cash in an amount equal to such Allowed Class 1 Secured Claim on the later of the Initial Distribution Date or the date such Class 1 Secured Claim becomes an Allowed Class 1 Secured Claim, or as soon thereafter as is practicable, or (iii) each holder of an Allowed Class 1 Secured Claim shall receive the Collateral securing its Allowed Class 1 Secured Claim on the later of the Initial Distribution Date or the date such Class 1 Secured Claim becomes an Allowed Class 1 Secured Claim, or as soon thereafter as practicable. | $15,000.00 | Impaired | 100% |

| Class | Type of Claim or Equity Interest | Treatment | Estimated Amount | Impairment | Estimated Recovery |
|---|---|---|---|---|---|
| 2 | Convenience Claims | On the later of the Initial Distribution Date or the date on which a specific Class 2 General Unsecured Claim becomes an Allowed Class 2 General Unsecured Claim, or as soon thereafter as practical, each holder of an Allowed Class 2 Convenience Claim shall receive, in full satisfaction, settlement, release, and discharge of and in exchange for such Claim, its Pro Rata share of the Convenience Fund. If any portion of the $100,000 Convenience Fund remains after payment of all Allowed Class 2 Convenience Claims, the remaining Cash will be distributed by the Plan Agent in accordance with the Terms of the Plan. | $100,000.00 | Impaired | Up to 100% (amount of claim or $1,500, whichever is less) |
| 3 | General Unsecured Claims | On the later of the Initial Distribution Date or the date on which a specific Class 3 General Unsecured Claim becomes an Allowed Class 3 General Unsecured Claim, or as soon thereafter as is practical, and from time to time thereafter, a holder of an Allowed Class 3 General Unsecured Claim shall receive, in full satisfaction, settlement, release, and discharge of and in exchange for such Claim, its Pro Rata share of the Estate that remains after payment of Administrative Claims, Priority Tax Claims, Other Priority Claims, Secured Claims, Convenience Claims, and the fees and expenses of the Plan Agent. | $3,500,000 to $31,000,000 | Impaired | 2-12% |
| 4 | Equity Interests | Holders of Equity Interests shall receive no Distribution. On the Effective Date, all Equity Interests shall be extinguished. | | Impaired | 0% |

# III.
# OVERVIEW OF CHAPTER 11

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under chapter 11, a debtor is authorized to reorganize its business for the benefit of itself, its creditors and equity holders, including through the sale or other liquidation of its assets. In addition to permitting rehabilitation of a debtor, another goal of chapter 11 is to promote equality of treatment for similarly situated creditors and equity holders with respect to the distribution of a debtor's assets. A debtor may also liquidate its assets in chapter 11.

The commencement of a chapter 11 case creates an estate that is comprised of all of the legal and equitable interests of the debtor as of the filing date. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor-in-possession."

The consummation of a plan is the principal objective of a chapter 11 case. A plan sets forth, among other things, the treatment of, and means for satisfying, claims against and equity interests in the debtor. Confirmation of a plan by the bankruptcy court makes the plan binding upon a debtor, any issuer of securities under the plan, any person acquiring property under the plan and any creditor or equity interest holder of a debtor. Subject to certain limited exceptions, the confirmation order protects a debtor from the collection of any debt or other liabilities that arose prior to the date of confirmation of the plan and substitutes therefor the obligations specified under the confirmed plan.

After a plan has been filed, the holders of claims against or equity interests in a debtor that are impaired by the plan are permitted to vote to accept or reject the plan. Before soliciting acceptances of the proposed plan, however, section 1125 of the Bankruptcy Code requires a plan proponent to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment about the plan. The Plan Proponent is submitting this Disclosure Statement to satisfy the requirements of section 1125 of the Bankruptcy Code.

# IV.
# COMPANY BACKGROUND

## A.    The Debtor.

The Debtor is a Delaware corporation, which, as of the Petition Date, was qualified and registered to do business in the State of Washington. It is the wholly owned subsidiary of CBI, a Washington corporation. The Plan does not address the assets and liabilities of CBI, but provides only that CBI shall receive no Distribution on account of its Equity Interests in the Debtor.

As of the Petition Date, the Board of Directors of the Debtor was composed of Ken Batali, John Schmidt, Eric Otterson, and Larry Destro (non voting). Eric Otterson and Larry Destro are no longer directors.

### B.    The Debtor's Business.

CBI began Taco Del Mar restaurant operations in 1992 and was founded by two brothers, James and John Schmidt. James Schmidt is a member of the Committee. Taco Del Mar grew into a small restaurant chain in Puget Sound. A decision was made to franchise the concept in 1992, at or about which time the Debtor was incorporated to act as the franchisor. Eventually, all of the restaurants formerly owned by CBI were sold to franchisees. By 2002, the chain had grown to about 70 restaurants and was operating at nearly break even. A critical decision was made to change the business model after 2002.

In order to accelerate growth beyond the Northwest market beginning in 2003, the Debtor began identifying third parties interested in assisting the Debtor in developing new restaurants in the United States and Canada and entering into Master Development Agreements ("MD Agreements") with them. As of the Petition Date, the Debtor had agreements with 19 such third parties ("MDs"). This model allowed the Debtor to receive initiation fees from the MDs, as well as franchise fees from new franchisees. Thereafter, MDs shared in royalties received from franchisees. During the growth period of the Debtor, revenues grew dramatically (from $950,000 in 2002 to over $5,400,000 in 2005). At the same time, expenses grew from $991,000 in 2002 to $5,481,000 in 2005. The Debtor's profits continued through 2005, but subsequently as the number of new franchises and MDs began to decline, the Debtor began losing money and continued to do so in every year from 2006-2009 (with 2009 accumulated losses exceeding $2,800,000). Restaurant counts went from 74 in 2003 to a high of 270 at the end of fiscal year 2008.

### C.    The Debtor's Prepetition Debt.

#### 1.    Secured Financing.

Banner Bank held a claim against the Debtor for loans made on August 25, 2009, and January 29, 2009, pursuant to certain Promissory Notes and a Security Agreement. The claim was secured by certain personal property described in a UCC-1 financing statement filed with the Delaware Secretary of State on February 17, 2009. The Banner Bank loans matured on January 26, 2010. On November 8, 2010, the Court entered the Order Granting Banner Bank's Motion to Distribute Proceeds of Sale in Payment of Secured Claim of Banner Bank. Banner Bank's secured claim in the amount of $483,902.22 as of October 12, 2010, plus any additional interest and all attorneys' fees incurred after September 30, 2010, was paid in full.

Regge K. Egger held a secured claim against the Debtor for a loan executed on or about May 10, 2007, pursuant to Promissory Notes and a Security Agreement. Mr. Egger filed a UCC-1 financing statement against the Debtor with the Delaware Secretary of State on or about May 11, 2007. On December 8, 2010, the Court entered the Order Granting Regge K. Egger's

Motion to Distribute Proceeds of Sale in Payment of Secured Claim. Mr. Egger's secured claim in the amount of $104,332.06 (as of November 30, 2010, plus any interest accrued and all attorneys' fees and costs incurred after November 30, 2010, was paid in full.

The Debtor also listed liability for certain car and other equipment leases, as well as a claim based on a judgment in the amount of $125,416.93 in favor of Paul and Shahnaz Hendifar, as secured debt on its Schedule D. However, the Plan Proponent's analysis indicates that remaining secured claims are likely to be zero.

### 2. Priority and Other Unsecured Debt.

The Plan Proponent's preliminary analysis of the Debtor's Schedules and proofs of claim on file with the Court, while potentially subject to reduction, indicate that (1) Priority Tax Claims are approximately $300,000, (2) there are less than $10,000 in Post-Petition Administrative Priority Claims, and (2) General Unsecured Claims of about $31 million have been filed. The largest Claims include $19 million in Claims asserted by MDs and a $7,779,819 Claim filed by The Coca-Cola Company, which the Plan Proponent believes will end up being Allowed at substantially lower amounts, resulting in a low end estimate of Allowed Claims of as little as $3,500,000. All estimates, according to the Plan Proponent's business judgment, may be materially higher or lower than the amount of General Unsecured Claims that is actually Allowed and, consequently, the estimated recovery to Creditors in Classes 2 and 3 may be different than those projected herein.

### V.
### EVENTS LEADING TO COMMENCEMENT OF THE CHAPTER 11 CASES

The weakness of the Debtor's development model (selecting poor franchisees and poor sites) and the weakness of the Taco Del Mar brand in non-core markets began to show. These weaknesses resulted in the closure of over 200 restaurants from 2005-2009. During this period, several competitive concepts were quickly expanding in the United States (Chipotle, Q'doba, Baja Fresh, and several others). These factors coupled with the Debtor's weakening financial condition and the economic downturn in the United States slowed new store growth and new market development for the Debtor.

During the period from 2005-2009, however, the growth of new stores in the Debtor's core markets had become a relatively stable base from which to re-launch the brand.

The Debtor's struggles over the three to four years preceding the Petition Date resulted in rising debt from $248,000 in 2002, to over $3,000,000 by the Petition Date. The debt resulted from recurring losses, poor expense management, litigation expenses related to the Debtor's guarantees of failed franchise leases, litigation expenses pertaining to the propriety of franchise sale, and numerous judgments against the Debtor resulting from such litigation.

Before the Petition Date, the Debtor pursued the sale of its assets and the entire company. However, none of the transactions were completed.

The Debtor filed its bankruptcy petition on January 22, 2010, due primarily to lack of cash and out of a desire to preserve its value as a going concern.

# VI.
# THE CHAPTER 11 CASE

### A.      Significant Early Motions.

During the first few weeks of this Chapter 11 Case, the Court entered orders authorizing the Debtor, among other things, to: (i) continue to use its existing cash management system and existing bank accounts; (ii) pay prepetition wages, salaries and employee benefits and withholdings; (iii) reject certain real property leases; (iv) use cash collateral (re-authorized twice subsequently); (v) reject Canadian MD Agreements; and (vi) limit notice of certain motions.

In addition, the Court entered orders authorizing the Debtor's retention of professional advisors, including (i) Karr Tuttle Campbell P.S. as Chapter 11 counsel, (ii) Graham & Dunn PC as special counsel re franchising issues; (iii) Emery Jamieson LLP as special Canadian counsel; (iv) RSM McGladrey, Inc. as accountants, and (v) Moodys LLP as Canadian accountants.

### B.      The Committee.

On February 1 and 5, 2010, the United States Trustee for the Western District of Washington appointed the Committee. The Committee is currently composed of representatives of The Coca-Cola Company; BigAds, Inc.; BullTrend Investments LLC; Charles and Emma Frye Free Public Art Museum; James Schmidt; and RNM Lakeville, LP.

The Committee has, with Court approval, employed and retained (i) Miller Nash LLP as its counsel, and (ii) Walker Nell Partners, Inc. as its financial advisor.

### C.      The Claims Process.

On March 3, 2010, the Court entered an Order (the "Bar Date Order") (Docket No. 103) requiring any person or entity holding or asserting a Claim against the Debtors (other than an Administrative Claim) to file a written proof of claim with the Court on or before April 15, 2010, or for claims arising from the rejection of a contract or lease, 30 days after rejection, if later. The deadline for filing certain rejection claims was November 10, 2010.

The Debtor has noted a hearing to approve and object to the Claims filed which is expected to be heard on April 8, 2011.

### D.      Sale of Substantially All the Debtor's Assets.

On May 5, 2010, the Court entered an order authorizing the free and clear sale of miscellaneous office equipment and other small personal property.

On September 14, 2010, the Court entered the Order Approving Assignment of Assets of Taco Del Mar Canadian Franchising Corp, ULC to Taco Del Mar Franchising Corp.

On October 12, 2010, after an auction conducted according to Court-authorized bidding procedures, the Court entered the Order Approving: (1) Sale, Pursuant to an Auction, of Substantially All of Debtors' Assets and Business Free and Clear of Liens; and Additional Relief; (2) Assumption and Assignment of Contracts; Rejection of Certain Contracts; Payment from Sale Proceeds of Certain Cure Costs. The Debtor subsequently closed the sale and effected the assignment to Franchise Brands, LLC, a Delaware corporation. The Court permitted payment of a break-up fee of $150,000 to the stalking horse bidder. The sale to Franchise Brands for a gross sale price of $$3,250,000 closed.

### E.    Professional Fees.

On December 9, 2010, the Court entered an order allowing and authorizing the payment of professional fees and expenses through September 2010 as follows: (1) Miller Nash LLP, fees of $134,774.00, expenses of $1,673.65; (2) Graham & Dunn PC, fees of $8,189.50; (3) Emery Jamieson, fees of $42,407.40, expenses of $2,876.52; (4) Walker Nell Partners, Inc., fees of $101,852.00, expenses of $2,519.81; and (5) Karr Tuttle Campbell P.S., fees of $356,739.50, expenses of $15,857.76.

### F.    Estate's Financial Position.

The Debtor currently holds $1,413,152.87 in proceeds from the sale of substantially all of its assets, plus about $200,000. Debtor additionally has approximately $350,000 in royalty receivables from franchisees in Canada which it intends to pursue for collection. Administrative Expenses are continuing to accrue.

## VII.
## SUMMARY OF THE PLAN

### A.    Introduction.

The Debtor's exclusive period to file a plan expired, and any party in interest may propose a plan. The Committee has filed a plan which proposes to take control from the Debtor to complete the administration of the Estate. The Debtor does not believe a plan is necessary, but is the Plan Proponent here to propose a plan which in effect maintains the status quo in the form of a Plan which will maximize the distribution to Creditors. As a legal matter, the Plan Proponent believes, and will demonstrate to the Court, that the Creditors will receive at least as much, and likely far more, in value under the Plan than they would receive in a liquidation under chapter 7 of the Bankruptcy Code.

In general, the Plan provides that the Debtor's Cash will be used to pay in full all Allowed Administrative Expenses, Priority Tax Claims, Other Priority Claims, and Secured Claims on the Effective Date. Holders of Class 2 Convenience Claims will possibly receive preferential payment from a special $100,000 fund (but only in the event that Allowed Claims in

this Class 2 do not exceed $100,000). Holders of Allowed Class 3 General Unsecured Claims will receive their Pro Rata share of Cash as soon as practicable and subject to certain reserves. The Plan Agent will have the right to prosecute all Causes of Action that the Committee designates, such as Avoidance Actions; however, at this time, the Committee has not identified the Causes of Action to be retained by the Estate, but will do so in the Plan Supplement. To the extent that there are any net recoveries from retained Causes of Action, the Plan Agent will distribute these assets to Creditors in the manner described in the Plan.

**THE FOLLOWING IS A SUMMARY OF SOME OF THE SIGNIFICANT ELEMENTS OF THE PLAN. THIS DISCLOSURE STATEMENT IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE MORE DETAILED INFORMATION SET FORTH IN THE PLAN.**

> **B.  General Discussion of Classification and Treatment of Administrative Claims, Claims and Equity Interests Under the Plan.**

Only administrative expenses, claims and equity interests that are "allowed" may receive distributions under a chapter 11 plan. An "allowed" administrative expense, claim or equity interest simply means that the Plan Agent agrees, or in the event of a dispute, that the Court determines, that the administrative expense, claim or equity interest, including the amount thereof, is in fact a valid obligation of, or equity interest in, the Debtor. Section 502(a) of the Bankruptcy Code provides that a timely filed administrative expense, claim or equity interest is automatically "allowed" unless the debtor or another party in interest objects. However, section 502(b) of the Bankruptcy Code specifies certain claims that may not be "allowed" in a bankruptcy case even if a proof of claim is filed. These include, without limitation, claims that are unenforceable under the governing agreement or applicable nonbankruptcy law, claims for unmatured interest on unsecured and/or undersecured obligations, property tax claims in excess of a debtor's equity in the property, claims for certain services that exceed their reasonable value, nonresidential real property lease and employment contract rejection damage claims in excess of specified amounts, and late-filed claims. In addition, Bankruptcy Rule 3003(c)(2) prohibits the allowance of any claim or equity interest that either is not listed on a debtor's schedules or is listed as disputed, contingent, or unliquidated if the holder has not filed a proof of claim or equity interest before the deadline to file proofs of claim and equity interests.

The Bankruptcy Code also requires that, for purposes of treatment and voting, a chapter 11 plan divides the different claims against, and equity interests in, the Debtors into separate classes based upon their legal nature. Claims of a substantially similar legal nature usually are classified together, as are equity interests of a substantially similar legal nature. Because an entity may hold multiple claims and/or equity interests which give rise to different legal rights, the holders of such claims and/or equity interests may find themselves as members of multiple classes of claims and/or equity interests.

Under a chapter 11 plan, the separate classes of claims and equity interests must be designated either as "impaired" (altered by the plan in any way) or "unimpaired" (unaltered by the plan). If a class of claims or interests is "impaired," the Bankruptcy Code affords certain

rights to the holders of such claims or interests, such as the right to vote on the plan (unless the plan provides for no distribution to the holder, in which case the holder is deemed to reject the plan), and the right to receive an amount under the chapter 11 plan that is not less than the value that the holder would receive if the debtor were liquidated under chapter 7. Under section 1124 of the Bankruptcy Code, a class of claims or interests is "impaired" unless, with respect to each claim or interest of such class, the plan: (i) does not alter the legal, equitable or contractual rights of the holders of such claims or interests; or (ii) irrespective of the holders' right to receive accelerated payment of such claims or interests after the occurrence of a default, cures all defaults (other than those arising from, among other things, the debtor's insolvency or the commencement of a bankruptcy case), reinstates the maturity of the claims or interests in the class, compensates the holders of such claims or interests for any damages incurred as a result of their reasonable reliance upon any acceleration rights and does not otherwise alter their legal, equitable or contractual rights. Typically, this means that the holder of an unimpaired claim will receive on the later of the effective date of the plan of reorganization or the date on which amounts owing are due and payable, payment in full, in cash, with postpetition interest to the extent permitted and provided under the governing agreement between the parties (or, if there is no agreement, under applicable nonbankruptcy law), and the remainder of the debtor's obligations, if any, will be performed as they come due in accordance with their terms. Thus, other than its right to accelerate the debtor's obligations, the holder of an unimpaired claim will be placed in the same position it would have been in had the debtor's case not been commenced.

Consistent with these requirements, the Plan divides the Claims against, and Equity Interests in, the Debtors into the following Classes and affords the treatments described below:

| | | |
|---|---|---|
| Unclassified | Administrative Claims | Not Impaired |
| Unclassified | Priority Tax Claims | Not Impaired |
| Unclassified | Other Priority Claims | Not Impaired |
| Class 1 | Secured Claims | May be Impaired |
| Class 2 | Convenience Claims | May be Impaired |
| Class 3 | General Unsecured Claims | Impaired |
| Class 4 | Equity Interests | Impaired |

The Plan is attached hereto as <u>Exhibit A</u> and, rather than its language being duplicated or paraphrased here, is incorporated herein by this reference for the purposes of disclosure.

# VIII.
## CERTAIN RISK FACTORS TO BE CONSIDERED

HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTOR SHOULD READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH BELOW AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT (AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH AND/OR INCORPORATED HEREIN BY REFERENCE), PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN. THESE RISK FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.

### A. Certain Bankruptcy Law Considerations.

#### 1. Risk of Non-Confirmation of the Plan.

Although the Plan Proponent believes that the Plan satisfies all of the requirements for confirmation by the Court, there can be no assurance that the Court will reach the same conclusion or that interested parties will not object to the Plan, thereby delaying or preventing confirmation. Moreover, there can be no assurance that modifications to the Plan will not be required for confirmation or that such modifications would not necessitate the resolicitation of votes to accept the Plan, as modified. There can be no assurance that the Plan will obtain sufficient accepting votes to satisfy the requirements of section 1126(c) of the Bankruptcy Code.

#### 2. Risk of Non-Occurrence of the Effective Date.

Operating in bankruptcy imposes significant risks on the Debtor's administration of its assets. Although the Plan Proponent believes that the Effective Date will occur on or around May 16, 2011, there can be no assurance as to such timing or that the conditions to the Effective Date contained in the Plan will ever occur.

### B. Certain Claim Treatment Considerations.

The estimation that the holders of Class 2 Convenience Claims will receive up to 100% of the Allowed Amount of their Claims is based on an assumption that only some of the holders of such claims will elect to participate in the Class. The estimation that the holders of Class 3 General Unsecured Claims will receive approximately 2% to 12% of the Allowed Amount of their Claims is based on the Plan Proponent's estimate of the dollar value of such Allowed Claims and the estimation of accrued and unpaid Administrative Claims, Tax Priority Claims, Other Priority Claims, and Secured Claims and estimated Administrative Claims through the Effective Date and the unpaid and future administrative expenses related to the Plan Administrator, Committee and Debtor professionals ("Professional Fees"). To the extent that the Allowed Amount of such Claims is ultimately greater than estimated, or the Administrative Claim liability is greater than estimated, the recovery to Class 3 would be proportionately

reduced. The ultimate percentage distribution on Class 3 Allowed Claims is dependent upon Professional Fees which won't be known with certainty until the final Distributions on such claims are made.

# IX.
# CONFIRMATION PROCEDURE

Under the Bankruptcy Code, the following steps must be taken to confirm the Plan:

**A.      Solicitation of Votes.**

In accordance with sections 1126 and 1129 of the Bankruptcy Code, the Claims in Class 1, Class 2, and Class 3 of the Plan are Impaired and are entitled to vote to accept or reject the Plan.  Holders of Class 4 Equity Interests shall receive no Distribution.  Accordingly, they are conclusively presumed to have rejected the Plan and shall not be permitted to vote on the Plan.

As to any Class of Claims entitled to vote on the Plan, the Bankruptcy Code defines acceptance of a plan by a class of claims as acceptance by holders of at least one-half in number and two-thirds in amount of the Allowed Claims of that Class that have timely voted to accept or reject a plan.

A vote may be disregarded if the Court determines, after notice and a hearing, that acceptance or rejection was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

**B.      The Confirmation Hearing.**

The Bankruptcy Code requires the Court, after notice, to hold a confirmation hearing.  The Confirmation Hearing in respect of the Plan has been scheduled for April 29, 2011 at 9:30 a.m. prevailing Pacific Time, before the Honorable Karen A. Overstreet, United States Bankruptcy Court for the Western District of Washington at Seattle, United States Courthouse, 701 Stewart Street, Room 7206, Seattle, Washington 98101.  The Confirmation Hearing may be adjourned from time to time by the Court without further notice except for an announcement of the adjourned date made at the Confirmation Hearing.  Any objection to confirmation must be made in writing and specify in detail the name and address of the objector, all grounds for the objection and the amount of the Claim(s) or Equity Interest(s) held by the objector.  Any such objection must be filed with the Court and served so that it is received by the Court and Debtor's attorneys at Karr Tuttle Campbell, (Karr Tuttle Campbell, 1201 Third Avenue, #2900, Seattle, WA  98101, Attn: George Treperinas)  on or before April 22, 2011 at 5:00 p.m. prevailing Pacific Time.

Objections to confirmation of the Plan are governed by Bankruptcy Rule 9014 and local rules and orders of the Court.

### C.   Confirmation.

At the Confirmation Hearing, the Court will confirm the Plan only if all of the requirements of section 1129 of the Bankruptcy Code are met.   Among the requirements for confirmation of a plan are that the plan is (i) accepted by all impaired classes of claims and equity interests or, if rejected by an impaired class, that the plan "does not discriminate unfairly" and is "fair and equitable" as to such class, (ii) feasible, and (iii) in the "best interests" of creditors and equity interest holders that are impaired under the Plan.

### 1.   Acceptance.

Because Class 1, Class 2, and Class 3 are or may be Impaired, in order for any of those Classes to accept the Plan, holders of at least one-half in number and two-thirds in amount of those voting in that Class must vote to accept the Plan.   Only those holders of Claims who actually vote to accept or reject the Plan count in the tabulation.

Class 4 also is Impaired and will receive no Distribution.   Class 4 is deemed not to have rejected the Plan.

### 2.   Unfair Discrimination and Fair and Equitable Tests.

The Bankruptcy Code contains provisions for the confirmation of a plan even if it is not accepted by all impaired classes, as long as at least one impaired class of claims (excluding insider votes) has voted to accept the plan.   The requirements for confirmation of a plan despite the non-acceptance by one or more impaired classes of claims (a "cramdown") are set forth in section 1129(b) of the Bankruptcy Code.

Under the "cramdown" provisions, a bankruptcy court may confirm a plan despite the lack of acceptance by an impaired class or classes if a bankruptcy court finds that (a) the plan does not discriminate unfairly with respect to any non-accepting impaired class, and (b) the plan is "fair and equitable" with respect to any such non-accepting impaired class.   A plan does not discriminate unfairly if, among other things, each dissenting class is treated substantially equally with respect to other classes of equal rank.   The plan must also satisfy the other requirements set forth in section 1129(a) of the Bankruptcy Code.

The Bankruptcy Code establishes different "fair and equitable" tests for holders of secured and unsecured claims.   A plan is fair and equitable as to a class of unsecured claims that rejects a plan if the plan provides that:  (a) each holder of a claim of the dissenting class receives or retains under the plan property of a value equal to the allowed amount of its unsecured claim; or (b) the holder of claims or interests that are junior to the claims of the holders of such unsecured claims do not receive or retain any property under the plan.

A plan is fair and equitable as to a class of secured claims that rejects a plan if the plan provides that:  (a) that the holder of a secured claim in the rejecting class retains the liens securing such claim, whether or not the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claim, and (b) the

holder of such claim receives deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property.

A plan is fair and equitable as to a class of equity interests that rejects a plan if the plan provides that: (a) the holder of an interest included in the rejecting class receives or retains on account of that interest property that has a value, as of the effective date of the plan, equal to the greatest of the allowed amount of any fixed liquidation preference to which such holder is entitled, and fixed redemption price to which such holder is entitled, or the value of such interest, or (b) that the holder of any interest that is junior to the interest of such class does not receive or retain under the plan on account of such junior interest any property at all.

Despite the general aspiration of chapter 11 that a debtor reorganize or be rehabilitated, the Bankruptcy Code also permits a liquidating plan to be confirmed.

### 3. Best Interests Test.

With respect to each Impaired Class of Claims or Interests, confirmation of the Plan requires that each holder of a Claim or Equity Interest either (i) accept the Plan or (ii) receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive or retain if the Debtor were liquidated under chapter 7 of the Bankruptcy Code.

To determine what holders of Claims or Equity Interests in each Impaired Class would receive if the Debtor were liquidated under chapter 7, the Court must determine the dollar amount that would be generated from the liquidation of the Debtors' assets and properties in the context of a chapter 7 liquidation case. The Cash amount that would be available for satisfaction of Claims would consist of the proceeds resulting from the disposition of the unencumbered assets and properties of the Debtors, augmented by any unencumbered Cash held by the Debtors at the time of the commencement of the liquidation case. Such Cash amount would be reduced by the amount of the costs and expenses of the liquidation and by such additional administrative and priority claims that might result from the use of chapter 7 for the purposes of liquidation.

The Debtor's costs of liquidation under chapter 7 would include the fees payable to a chapter 7 trustee, as well as those fees that might be payable to attorneys and other professionals that such a trustee might engage. The Plan Proponent believes that these would exceed the costs incurred by the Plan Agent and his professionals, who would already have great familiarity with the case and the Debtor's assets and liabilities.

# X.
## ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

If the Plan is not confirmed and consummated, the alternatives to the Plan include (i) liquidation of the Debtor under chapter 7 of the Bankruptcy Code, (ii) an alternative plan of liquidation, or (iii) dismissal of the Chapter 11 Case.

### A.    Liquidation and Administration Without A Plan

Debtor proposes this Plan as an alternative to its preferred alternative, which would be for the Debtor to complete administration of the estate substantially as set forth in the Plan, with distribution to Creditors with Allowed Claims without the expense of confirming a Plan. Debtor has its Motion to Approve and Object to Claims pending to be heard by the Court on April 8, 2011. Once the Claims are resolved, at least a partial distribution may be made in the event Debtor continues to pursue collection and/or avoidance claims thereafter for the benefit of Creditors.

### B.    Liquidation Under Chapter 7.

If neither Debtor's plan nor the Committee's plan is confirmed, this Chapter 11 Case may be converted to a case under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be elected to liquidate the Debtor's assets for distribution in accordance with the priorities established by chapter 7 of the Bankruptcy Code. The net liquidation value in chapter 7 is not anticipated to be greater the amount to be administered under the Plan. In fact, at this stage, the additional delay and overlay of chapter 7 administrative costs would make it unlikely that a comparable return could be realized. For the reasons articulated in Article IX of this Disclosure Statement, the Plan Proponent believes that a liquidation under chapter 7 would not result in greater Distributions to the Debtor's Creditors, and could even result in no Distributions being made to any unsecured creditors. At a minimum, the delay in making Distributions would be much lengthier in chapter 7, whereas Distributions under the Plan could commenced as early as May 2011.

### C.    Liquidation Under Committee Proposed Plan.

If Debtor's Plan is not confirmed, the Committee's plan could be confirmed which would result in substantially the same administration by a Plan Agent selected by the Committee at greater expense and potential greater delay than administration by the Debtor under the Debtor's Plan or administration without any plan.

### D.    Alternative Plan of Reorganization or Plan of Liquidation.

If t neither Debtor's plan nor the Committee's plan confirmed, the Court could confirm a different plan. As substantially all the Debtor's assets have been sold, there is no longer any business to reorganize; any alternative plan would also almost certainly provide for a basic liquidation. The Debtor has taken no action toward proposing a plan, and any plan proposed by the Debtor would still have to be drafted and take much longer to confirm than the

Plan. The Plan Proponent believes that the Plan, as described herein, enables Creditors to realize the highest and best value as quickly as possible. Other alternatives could involve diminished recoveries, significant delay, uncertainty, and substantial additional administrative costs. The Plan Proponent believes that the Plan provides the best recovery to the Creditors.

## C.    Dismissal.

The Court could also dismiss the Chapter 11 Case. It is questionable whether Distributions could be made under a mere dismissal order without the right of Creditors to vote and other protections available under chapter 11. Upon dismissal, the Estate would disappear and all Causes of Action arising under the Bankruptcy Code would be foregone. Dismissal and Distributions would likely have to be delayed until all objections to Claims were finally resolved.

## XI.
## TAX CONSIDERATIONS

The confirmation and execution of the Plan may have tax consequences to holders of Claims and Equity Interests. The Plan Proponent offers no opinion as to the tax consequences to holders of Claims and Equity Interests as a result of the confirmation and Distributions under the Plan. All holders should satisfy themselves as to their own tax consequences by obtaining independent advice from their own tax advisors.

## CONCLUSION

The Plan Proponent believes the Plan is in the best interests of all Creditors and urges those entitled to vote to accept the Plan.

DATED this 28th day of February, 2011.

TACO DEL MAR FRANCHISING CORP.

By: Richard Braa
Its:    CFO